RENDERED: MAY 17, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0931-MR

LAMKIN WEALTH MANAGEMENT,
LLC AND LOUISVILLE WEALTH
MANAGEMENT, LLC                                                    APPELLANTS


APPEAL FROM JEFFERSON CIRCUIT COURT
v.          HONORABLE ANNIE O'CONNELL, JUDGE
ACTION NO. 19-CI-000458


BRUCE LINDSAY; GREGORY W.
SMITH; AND JONATHAN UPTON                                          APPELLEES


OPINION
REVERSING AND
REMANDING

** ** ** ** **

BEFORE: COMBS, EASTON, AND TAYLOR, JUDGES.

COMBS, JUDGE: In this appeal, Lamkin Wealth Management, LLC, and

Louisville Wealth Management, LLC, both financial services firms, appeal orders

of the Jefferson Circuit Court granting summary judgment to Bruce Lindsay,

Jonathan Upton, and Gregory Smith -- brokers and investment advisers formerly

associated with Lamkin Wealth Management, LLC. After our review, we reverse and remand for further proceedings.

Lamkin Wealth Management, LLC (Lamkin Wealth), was organized by Mark Lamkin (not a party to these proceedings), who is its sole member. Its associates provide a variety of financial services and investment advice to clients from its Louisville office. The associates leverage the company brand to promote their services and the business organization to hire support staff, pay overhead, and enter into contracts. Lamkin Wealth is not a brokerage firm and is not registered with Kentucky's Department of Financial Institutions nor with the Securities and Exchange Commission. Louisville Wealth Management, LLC, is a wholly owned subsidiary of Lamkin Wealth. It is a registered Kentucky insurance agency.

In order to buy and sell securities as a broker, an individual is required to be registered with a brokerage firm. Separately, he can provide financial advising services as an investment adviser representative (IAR) of a registered investment adviser (RIA). To conduct his business, Lamkin signed a registered representative agreement with LPL Financial, LLC (LPL Financial), in 2001. He could buy and sell securities and provide investment advice to clients.

LPL Financial is one of the largest independent broker-dealers and RIAs in the wealth management business. Among other services, it provides a trading platform and accounting support to independent financial advisers and

brokers across the country. LPL Financial assigns IARs a "branch" identification number to indicate the firm or entity with which the adviser works. It also assigns a "rep code" to individual advisers working with the branch. LPL Financial is the custodian of individual client accounts. It collects fees and commissions associated with stock trades, keeps a percentage, and pays out the remaining compensation to registered representatives. It can provide its stock trading platform and other services to numerous financial advisors and firms in the same geographical area, all of whom can compete directly for business.

For many years before February 2015, Bruce Lindsay worked as the sole proprietor of his own financial services company. Lindsay registered with LPL Financial in 1988.

In February 2015, Lindsay entered into an asset purchase agreement with Lamkin Wealth. In exchange for the sum of $513,000.00, Lamkin Wealth acquired the assets of Lindsay's business, which included client lists, client files, and good-will (Lindsay's "book of business"). The parties agreed to work together to "effect the smooth transition of the control and operation of Seller's Business from Seller to Buyer." To that end, Lindsay agreed to work as an independent contractor providing full-time wealth management and financial advisory services to clients of Lamkin Wealth, including those clients that Lindsay brought with him to Lamkin Wealth. This is not an unusual arrangement.

Lindsay retained his own, separate LPL Financial branch number. Commissions earned on client accounts were divided by LPL Financial between Lindsay and Mark Lamkin based upon their individual "rep codes." As a matter of course, LPL Financial continued to be the custodian of all client accounts.

The asset purchase agreement provided that Lindsay would not "directly or indirectly solicit or divert any business, activity or service related to [Lamkin Wealth's] business" from anyone who is or was an actual, potential, or prospective customer or client of Lamkin Wealth. This restriction on Lindsay's solicitation of clients took effect at closing and continued for the longer of either a five-year period or, if Lindsay were to become disengaged from Lamkin Wealth, a three-year period. The agreement did not require that transactions and accounting be conducted through LPL Financial or that any associate of Lamkin Wealth would remain registered with LPL Financial. The agreement provided a specific method of calculating liquidated damages upon the breach of its provisions.

Gregory Smith had worked in the financial services industry for many years when he began working for Lamkin Wealth as an independent contractor in 2010. He, too, registered with LPL Financial as a broker and an IAR and was assigned a "rep code" by LPL Financial. His "rep code" was assigned to client accounts for which he was paid a portion of the commissions he shared with Mark Lamkin under a common branch code.

In June 2015, Smith executed an agreement providing, in part, that while he rendered services to Lamkin Wealth and for a period of twenty-four (24) months thereafter, he would not "directly, or indirectly, on [his] own behalf or by aiding any other individual or entity, call for, solicit, nor if requested by a Client(s), accept the business of any of [Lamkin Wealth's clients] with whom [Smith] had personal contact and did business within the twelve (12) month period immediately prior to the end of [Smith's] services . . . ." Smith specifically acknowledged in the agreement that "all clients managed by [Smith] through [Lamkin Wealth] within twelve (12) months preceding a termination of [Smith's] services are clients of [Lamkin Wealth]."

Jonathan Upton began working for Lamkin Wealth as an employee in 2007 and registered as a broker with LPL Financial at that time. He did not have client accounts directly associated with his own "rep code." Instead, he worked on accounts that were associated with Lamkin's "rep code." He was paid a base salary and a percentage of revenue generated under Mark Lamkin's "rep code."

In August 2014, Upton signed an agreement providing, in part, that while he rendered services to Lamkin Wealth and for a period of twenty-four (24) months thereafter, he would not "directly, or indirectly, on [his] own behalf or by aiding any other individual or entity, call for, solicit, nor if requested by a Client(s), accept the business of any of [Lamkin Wealth's] with whom [he] had

personal contact and did business within the twelve (12) month period immediately prior to the end of [Upton's] services . . . ." Upton specifically acknowledged in the agreement that "all clients managed by [Upton] through [Lamkin Wealth] within twelve (12) months preceding a termination of [Upton's] services are clients of [Lamkin Wealth]."

Two other individuals were also associated with Lamkin Wealth: Neil Watkins and Douglas Obradovich. Neil Watkins was registered with LPL Financial as a broker and IAR. Obradovich was registered as a broker with LPL Financial.

In the autumn of 2018, LPL Financial discharged Mark Lamkin. According to documentation maintained by the Financial Industry Regulatory Authority (FINRA), a non-governmental securities firm regulator, LPL Financial discharged Lamkin because it believed that Lamkin received or benefitted from loans made by LPL Financial's account holders, failed to disclose business activities with LPL Financial's account holders, and solicited investors to participate in private investments without obtaining LPL Financial's approval. Once Mark Lamkin was discharged by LPL Financial, he could no longer provide investment advice or initiate trades on behalf of clients. He was forbidden to have contact with clients regarding their brokerage accounts either directly or indirectly through Lamkin Wealth. LPL Financial removed Mark Lamkin from all client

accounts in its custody. Mark Lamkin's client accounts were transferred to the "rep code" of Neil Watkins.

LPL Financial discharged Neil Watkins at the end of November 2018. It did so based on its belief that Watkins facilitated the distribution of advisory fees to an unregistered person -- Mark Lamkin. LPL Financial alleged that Douglas Obradovich facilitated the distribution of commissions to an unregistered person (Mark Lamkin). In response to that allegation, Obradovich resigned his registration with LPL Financial at the end of November 2018.

On December 5, 2018, Lindsay, Smith, and Upton simultaneously ended their individual associations with Lamkin Wealth. Lindsay and Smith continued their registration with LPL Financial uninterrupted, and Smith applied for his own branch code. Upton continued his registration with LPL Financial as a broker and also applied for his own branch code. Upton registered as an IAR with LPL Financial within a week. Each of the men continued to provide services to clients as before.

On December 7, 2018, Mark Lamkin registered with Calton & Associates, Inc., a dealer-broker and RIA competing directly with LPL Financial.

In February 2019, Lindsay, Smith, and Upton opened Centris Wealth Management in Middletown, Kentucky. They provided wealth management

services to many of the same clients with whom they had worked with at Lamkin Wealth.

On January 23, 2019, Lamkin Wealth filed its complaint against Lindsay. It alleged, in part, that Lindsay breached the terms of the asset purchase agreement "by leaving [Lamkin Wealth's] office . . . and taking clients and client business belonging to [Lamkin Wealth] with him . . . ." Before filing his answer, Lindsay filed a motion to dismiss. The motion was denied by an Order entered on June 18, 2019.

On July 31, 2019, Lamkin Wealth tendered its first amended complaint. Louisville Wealth Management, LLC, was included as a party plaintiff, and Jonathan Upton and Gregory Smith were named as additional defendants. The amended complaint alleged that both Upton and Smith violated provisions of the parties' non-solicitation agreements by failing to pay the agreed sums necessary to be released from the terms of their individual agreements. The amended complaint alleged that each of the defendants had breached their duty of good faith and fair dealing by unlawfully orchestrating and coordinating their simultaneous departure from Lamkin Wealth "so as to cause [Lamkin Wealth] to be unable to react or plan accordingly and so as to argue that [Lamkin Wealth] was legally unable to provide services to its clients." It also alleged that the defendants interfered with Lamkin Wealth's actual or perspective economic advantage, misappropriated trade secrets,

and engaged in a civil conspiracy. Finally, it alleged that Smith converted unearned commissions.

Each of the defendants answered the complaint and asserted counterclaims. Lamkin Wealth replied, and discovery ensued.

In April 2020, Lindsay, Smith, and Upton filed a motion for partial summary judgment. They contended that they were entitled to judgment as a matter of law, in part, because there was no reasonable basis upon which to enforce the restrictive covenants. They argued that undisputed facts showed that Lamkin Wealth had no legitimate business interest in the clients that it claims they had "stolen" when they left Lamkin Wealth in early-December 2018. They explained that at the time they resigned their positions, there were no other registered brokers or IARs working with Lamkin Wealth who could have provided wealth management services to its clients.

Lamkin Wealth filed a memorandum and argued that a partial summary judgment in favor of Lindsay, Smith, and Upton was improper; it also filed its own motion for summary judgment. Following a hearing, the court denied the motion of Lamkin Wealth but granted the motion for partial summary judgment filed by Lindsay, Smith, and Upton.

In its Order of August 18, 2021, the circuit court concluded as follows:

At the time the Defendants left [Lamkin Wealth], the company was unable to provide any investment advice. No one at [Lamkin Wealth] could have worked for the clients by conducting securities trades for those clients. Since [Lamkin Wealth] was not affiliated with a broker dealer, there was no way to create and house accounts on behalf of [Lamkin Wealth]. Given that [Lamkin Wealth] had no legitimate business interest to protect at the time the Defendants left, the covenant not to compete would be unreasonable. [Lamkin Wealth] could have asked the clients to return after a new broker dealer had been obtained.

While [Lamkin Wealth] was an independent business solely owned by Mark Lamkin, it never had any clients and was not offering securities through [LPL Financial]. Given that Mark Lamkin was fired for securities violations from [LPL Financial], there were no legitimate business interests remaining and, therefore, the noncompete agreement was not reasonable and shall not be enforced.

(Footnote omitted.)

Lamkin Wealth filed a motion to alter, amend, or vacate the partial summary judgment. With respect to the summary judgment in favor of Lindsay, Smith, and Upton premised on the ground that Lamkin Wealth had no legitimate business interest to protect, Lamkin Wealth argued that it was *at best* premature in light of the evidence. It observed that a factfinder could not evaluate the interests of the business as it existed only **after** Lindsay, Smith, and Upton left Lamkin Wealth and had taken with them the book of business because until that critical moment, its business was being correctly transacted by its associates -- Lindsay,

Smith, and Upton. It argued that Mark Lamkin's migration to another broker-dealer meant that Lamkin Wealth's business interests would have continued uninterrupted if its clients had not been harvested by the former associates.

Lamkin Wealth cited our unpublished opinion in *Mountain Comprehensive Health Corp. v. Gibson*, No. 2013-CA-000373-MR, 2015 WL 1194508 (Ky. App. Mar. 13, 2015), in which we held that a genuine issue of material fact existed as to whether a clinic had a legitimate business interest to protect and whether it could enforce a covenant restricting a physician assistant's subsequent employment where it was unclear whether the physician's assistant could have continued to provide support to a different physician at the clinic. Through its order entered on January 13, 2022, the Jefferson Circuit Court denied Lamkin Wealth's motion.

Subsequently, Lindsay, Smith, and Upton filed a second motion for partial summary judgment. They argued that they were entitled to summary judgment with respect to Lamkin Wealth's claims that they breached their duty of good faith and fair dealing, engaged in a civil conspiracy, and interfered with Lamkin Wealth's actual or prospective economic advantage. The circuit court granted the motion and denied the subsequent motion to alter, amend, or vacate its Order.

On July 31, 2023, the court's Order of final resolution was entered. The Order recited that separate Orders of partial dismissal had resolved most of the claims asserted in Lamkin Wealth's amended complaint as well as the related counterclaims. The remaining claims and any remaining counterclaims were dismissed as settled by the parties, and the court declared its Order final and appealable with no just cause for delay. This appeal followed.

On appeal, Lamkin Wealth argues that the trial court erred by granting the motions for partial summary judgment and dismissing its claims for breach of contract, civil conspiracy, and interference with an actual or prospective economic advantage. To recapitulate, the trial court determined that Lamkin Wealth had neither clients nor legitimate business interests to protect and that, therefore, the agreements binding Lindsay, Smith, and Upton were unenforceable. Lamkin Wealth's challenge to that determination is at the center of the appeal.

Summary judgment is properly granted where "the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR[1] 56.03. Because summary judgment involves only questions of law and not the resolution of disputed material facts, we may not defer to the trial court's

---

[1] Kentucky Rules of Civil Procedure.

-12-

decision. *Goldsmith v. Allied Building Components, Inc.*, 833 S.W.2d 378 (Ky. 1992). Instead, we review the decision *de novo*. *Cumberland Valley Contractors, Inc. v. Bell County Coal Corp.*, 238 S.W.3d 644 (Ky. 2007).

Lamkin Wealth argues that the plain language of the parties' agreements, the sworn affidavit of Mark Lamkin, and the deposition testimony of Lindsay, Smith, and Upton all indicate that Lamkin Wealth had a legitimate, ongoing, and viable multi-million-dollar business up until the moment the associates absconded with its clients. It contends that this evidence established its legitimate business interest in enforcing the restrictive covenants and necessarily precluded summary judgment in favor of Lindsay, Smith, and Upton. It contends that it is not prevented by public policy from enforcing the restrictive covenants contained in the parties' separate agreements.

At the outset of our analysis, we note that Kentucky favors the enforcement of restrictive covenants. In *Lareau v. O'Nan*, 355 S.W.2d 679, 681 (Ky. 1962), the Court in *Laueau* held that "[t]here is no basic public policy against such covenants, particularly when they involve professional services. In fact, the policy of this state is to enforce them unless very serious inequities would result." (citation omitted).

In *Mountain Comprehensive Health Corp. v. Gibson*, *supra*, we reviewed a restrictive covenant that prevented an OB/GYN's physician's assistant

-13-

from supporting the clinic's former employee-physician at another location for one year following her last date of employment. The trial court concluded that the restrictive covenant was void for public policy reasons. The trial court's holding was based upon its determination that the covenant served no legitimate business purpose.

In addressing the reasoning of the trial court, we began our analysis by noting that an agreement in restraint of trade is reasonable if the restriction is aimed at providing fair protection to the interests of the covenantee and is not so burdensome as to interfere with the public interests or impose undue hardship on the party restricted. The restricted party, Gibson, was a physician's assistant working under the supervision of Dr. Baker, an OB/GYN practicing at Mountain Comprehensive's Whitesburg clinic. Dr. Baker announced that he was leaving, and Gibson left Mountain Comprehensive's clinic to work under his supervision at a nearby facility. We determined that a genuine issue of material fact existed as to whether the restrictive covenant was unenforceable because it allegedly served no legitimate business purpose. The issue of material fact was whether Gibson could have worked as a primary care physician's assistant to a general practice physician at Mountain Compehensive's clinic or whether a different OB/GYN might have been available to supervise her at the clinic. These issues of material fact were deemed relevant to any determination concerning Mountain Comprehensive's

-14-

continued legitimate business interest in enforcing the restrictive covenant against Gibson. We reversed the summary judgment because we recognized the existence of that material fact as precluding its entry.

Turning to the evidence presented in the case now before us, we note the following sequence of events. During the pre-trial litigation, Lindsay admitted that at the time he left Lamkin Wealth for Centris Wealth Management, he retained possession of the client lists, client files, and goodwill that he developed throughout his career and that these accounts were in much the same state as they were when he sold them to Lamkin Wealth. He admitted that after he left Lamkin Wealth, he began to keep the entirety of his "rep code" commissions that had previously been subject to division with Mark Lamkin. With respect to the company, Lindsay explained that "until the three of us left and there were no longer any licensed people there, it was my assumption at that time that it [Lamkin Wealth] existed in whatever damaged form."

In his deposition, Upton explained that he left Lamkin Wealth "because I was fearful, that potentially, regulators could come in and shut the office down . . . that [LPL Financial] could come in and -- and either shut the branch down or -- or have other reason to let more individuals go if they continued to work in [Lamkin Wealth's] office." However, he did not indicate that the company was incapable of conducting its business at any time before he left. In

fact, his statements indicate that the company continued its business much as before.

Finally, Smith admitted that after Mark Lamkin was discharged from LPL Financial, he (Smith) continued to receive commissions directly from LPL Financial with respect to the client accounts that Smith continued to service just as before. With reference to this time-frame, Smith explained that "all of us were trying very hard to keep everything together." Smith met with Mark Lamkin "with intentions of [Lamkin's] proceeding or getting licensed with a broker-dealer that was affiliated with Advisors Excel." When asked about sharing commissions after the switch to a new broker-dealer, Smith testified, "Once we get into a new broker-dealer. At that time, we were all hoping and thinking that we were going to stay together as a team and land a reputable broker-dealer and continue to operate together." Smith was asked the follow-up question: "[a]nd then you all would transition all the customer accounts to that platform, whoever the new broker-dealer would be?" Smith replied, "That's correct."

With respect to whether Lamkin Wealth had a legitimate business interest in enforcing its restrictive covenants, it appears that indeed it did -- at least until the moment that Lindsay, Smith, and Upton discontinued their association with it and took the clients who had worked with them at Lamkin Wealth.

Lindsay, Smith, and Upton freely executed the non-solicitation agreements.  The covenants were not overly broad, and the associates had a clear understanding of what conduct was prohibited.  As noted above, Kentucky strongly favors enforcement of such covenants -- especially where they involve the provision of professional services.  Enforcement of the agreements does not appear to violate public policy.  Moreover, the decision to leave the company simultaneously, thereby leaving it potentially to founder, cannot legitimately serve to immunize them from an exposure to legal action to enforce the restrictions.

We are persuaded that the circuit court erred by concluding -- as a matter of law -- that Lamkin Wealth could not enforce its restrictive covenants.  Consequently, it also erred by concluding that the remaining claims of Lamkin Wealth (including breach of the duty of good faith and fair dealing, civil conspiracy, and interference with Lamkin Wealth's actual or prospective economic advantage) were null as well.

Consequently, the Orders of the Jefferson Circuit Court granting summary judgment of the Appellees are reversed, and this case is remanded for further proceedings.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

John D. Cox
Petersen S. Thomas
Louisville, Kentucky

BRIEF FOR APPELLEES:

Scott P. Zoppoth
Louisville, Kentucky